# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP619 |
| COMPLETE TITLE: | In the matter of the mental commitment of J.M.: |

Winnebago County,
            Petitioner-Respondent,
        v.
J. M.,
            Respondent-Appellant-Petitioner.

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 372 Wis. 2d 834, 890 N.W.2d 49
(2016 – Unpublished)

| | |
|---|---|
| OPINION FILED: | April 18, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 7, 2017 |

| SOURCE OF APPEAL: | |
|---|---|
| COURT: | Circuit |
| COUNTY: | Winnebago |
| JUDGE: | Karen L. Seifert |

| JUSTICES: | |
|---|---|
| CONCURRED: | A.W. BRADLEY, J., concurs (opinion filed). |
| DISSENTED: | |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the respondent-appellant-petitioner, there were briefs and an oral argument by *Colleen D. Ball*, assistant state public defender.

For the petitioner-respondent, there was a brief and oral argument by *James A. Kearney*, assistant corporation counsel.

An amicus curiae brief was filed on behalf of National Disability Rights Network by *Kendall W. Harrison*, *Bryan J. Cahill*, *Allison W. Reimann*, and *Godfrey & Kahn, S.C.*, Madison.

**2018 WI 37**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2016AP619
(L.C. No. 2015ME617)

STATE OF WISCONSIN : IN SUPREME COURT

**In the matter of the mental commitment of J.M.**

**Winnebago County,**

**Petitioner-Respondent,**

v.

**J. M.,**

**Respondent-Appellant-Petitioner.**

**FILED**

**APR 18, 2018**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 SHIRLEY S. ABRAHAMSON, J. This review involves a Chapter 51 commitment-extension proceeding. The unpublished decision of the court of appeals affirmed an order of the circuit court for Winnebago County, Karen L. Seifert, Judge,

denying J.M.'s motion for post-disposition relief.[1] J.M. seeks relief, claiming ineffective assistance of counsel.

¶2 Three questions are presented to this court:

¶3 First, does J.M. have a statutory right to effective assistance of counsel at a Chapter 51 commitment-extension proceeding, and if so, what standard should apply in evaluating a claim of ineffective assistance of counsel?

¶4 Second, did the failure of J.M.'s trial counsel to object to, prevent the admission of, or request a curative instruction regarding evidence presented to the jury of J.M.'s status as a prisoner (including J.M.'s wearing prison garb) constitute ineffective assistance of counsel?

¶5 Third, is J.M. entitled to a new Chapter 51 commitment-extension proceeding in the interest of justice because the jury was repeatedly exposed to evidence of J.M.'s status as a prisoner and the circuit court gave conflicting jury instructions?

¶6 We respond as follows to these questions:

¶7 First, J.M. had a statutory right to effective assistance of counsel in his Chapter 51 commitment-extension hearing. The legislature has provided that the subject of every civil commitment proceeding is entitled to be "represented by adversary counsel." Wis. Stat. § 51.20(3) (2015-16).[2] When the

---

[1] Winnebago Cnty. v. J.M., No. 2016AP619, unpublished slip op. (Wis. Ct. App. Nov. 9, 2016).

[2] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

2

legislature provides the right to be "represented by counsel," the legislature intends that right to include <u>effective</u> assistance of counsel. <u>In re M.D.(S).</u>, 168 Wis. 2d 995, 1004, 485 N.W.2d 52 (1992). The standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), is the correct standard for evaluating a claim of ineffective assistance of counsel in a commitment-extension hearing.

¶8 Second, given the overwhelming evidence presented by Winnebago County at the commitment-extension proceeding, J.M. has not shown that a reasonable probability exists that the result of the proceeding would have been different had his trial counsel's performance not been allegedly deficient regarding J.M.'s appearance in prison garb.

¶9 Third, J.M. has not established that he is entitled to a new trial under Wis. Stat. § 751.06 on the ground that his wearing of prison garb during the trial so distracted the jury "that the real controversy [was] not [] fully tried," and justice was miscarried. Moreover, the circuit court's conflicting jury instructions likewise do not entitle J.M. to a new trial in the interest of justice.

¶10 Accordingly, we affirm the decision of the court of appeals.

I

¶11 The facts are undisputed for purposes of this review.[3] On November 20, 2014, J.M. was involuntarily committed for a period of one year pursuant to Wis. Stat. § 51.20. In 2015, Winnebago County filed a petition to extend J.M.'s commitment. J.M. requested and received a jury trial on the petition.

¶12 Prior to trial, J.M.'s counsel asked the Wisconsin Resource Center (where J.M. was being held) to ensure that J.M. wore civilian clothes on the day of the trial on his petition. Despite his counsel's request and for reasons not in the record, J.M. appeared at his jury trial dressed in prison garb, shackled, and accompanied by two uniformed guards from the Department of Corrections. J.M.'s trial counsel did not seek a continuance when J.M. appeared in his prison garb but did persuade the circuit court to have J.M.'s shackles removed.[4]

¶13 During voir dire, J.M.'s trial counsel drew attention to J.M.'s prison garb:

> The kind of apparel that [J.M.'s] wearing, he's an inmate of the Wisconsin Correctional system, but this

---

[3] On November 20, 2017, J.M. filed a motion to strike certain facts asserted by Winnebago County during oral argument before this court. On December 6, 2017, Winnebago County filed a response stating that it concurs with J.M.'s request that this court not consider any facts stated by Winnebago County during oral argument that are not part of the record.

J.M.'s motion is granted. Facts asserted by Winnebago County during oral argument that do not appear in the record are not considered by the court in resolving the instant case.

[4] J.M. was required to wear a stun belt around his ankle, but the stun belt was not visible to the jury.

4

isn't a criminal case, as the judge had advised you, this is one involving a mental commitment for him.

Does anyone feel because of the fact that he's an inmate with the correctional system that they wouldn't be able to give a fair opinion or evaluate things fairly?

¶14 J.M.'s trial counsel once again addressed J.M.'s prison garb during opening statements:

As I mentioned earlier, [J.M.] is an inmate of the Wisconsin correctional system. He was transferred to the Wisconsin Resource Center right next to the Winnebago Mental Health Institute and he's receiving treatment and care there. It's my understanding that he's likely or they developed plans to try to transfer him back into the regular community of prisoners in one of the facilities here in the state, that's the goal they try to reach and that's what he's in prison for or what he's involved in, that's really not our affair, but should commitment be imposed upon [J.M.]

¶15 After opening statements, the County called two expert witnesses to testify. Both had met with and evaluated J.M.

¶16 First, the County called Dr. Marshall Bales, a medical doctor board certified in general psychiatry. Dr. Bales based his testimony on the following: (1) an examination of J.M. that took place on November 11, 2015; (2) a review of J.M.'s treatment records; and (3) a discussion with correctional officers who had interacted with J.M.

¶17 Dr. Bales testified at trial that J.M.'s diagnoses were schizophrenia and antisocial personality disorder. Further, Dr. Bales testified that "[i]t was abundantly clear" after meeting J.M. for a brief time that J.M. is severely mentally ill.

¶18 During his testimony, Dr. Bales twice reiterated that he terminated the evaluation of J.M. early because J.M.'s behavior made Dr. Bales fear for his safety. Dr. Bales also testified that it was his opinion, based upon J.M.'s treatment records, that if J.M.'s involuntary commitment expires, J.M. will stop taking his medication and will become more delusional and dangerous.

¶19 Second, the County called Dr. Barbara Waedekin, a psychiatrist employed by the Wisconsin Resource Center. Dr. Waedekin had served as J.M.'s treating psychiatrist since March 28, 2014, and saw J.M. approximately 19 to 20 times before the instant Chapter 51 commitment-extension proceeding. Dr. Waedekin based her opinions on the following: (1) her interactions with J.M.; (2) a review of his treatment records; and (3) communications with other staff at Wisconsin Resource Center who interacted with him.

¶20 Dr. Waedekin testified that J.M. has a substantial disorder of thought, mood, and perception that grossly impairs his behavior, judgment, and capacity to recognize reality. She testified that J.M. believes that he is the "Lord God Jesus Christ Omnipotent" and that he wants his records at the Department of Corrections to reflect that identity. Dr. Waedekin further testified that J.M. denies having hepatitis despite a positive blood test because he claims his blood is mixed with Jeffrey Dahmer's.

¶21 Dr. Waedekin offered several examples of J.M.'s violent behavior, including charging doors, attempting to grab

6

staff through the trap door in his cell, spitting at staff, and throwing things. She described one particular instance when she met with J.M. to advise him that an extension of his commitment was being requested. When she brought up J.M.'s medication during that meeting, he became agitated and began yelling at her:

> He stated that he was my Lord, God Jesus Christ, he addressed me by my first name and he kept saying he was damming [sic] me. He also was yelling that I was lying.

> He continued to get more and more agitated, stood up, and was approaching me such that the PCT [patient care technician] told him he had to leave, that he had to go through the door with him and out of the office.

¶22 Dr. Waedekin further testified that during this interaction, J.M. was very menacing and threatening towards her and that J.M. had been deemed one of the most dangerous individuals at the facility by one of the guards because he had a volatile anger that could erupt without warning. Dr. Waedekin explained that although J.M. was responding well to treatment, he would "become more violent" if he did not take his medication and that J.M. was unlikely to take his medication without an order to do so.

¶23 In contrast, J.M. testified that he had calmed down and that the instances Dr. Waedekin described had happened when he was "still very angry." J.M. stated his belief that he was not mentally ill or dangerous and that the experts' conclusions were "opinions, not facts." Furthermore, J.M. confirmed on the stand that he was "Jesus the Lord" and elaborated on this

7

belief, claiming, "I was born from the house of the Lord, it's the house that I came from and that's who I am." He also testified that he had the ability to damn people.

¶24 Pursuant to Wis. Stat. § 51.20(1)(a), the jury was instructed to determine (1) whether J.M. was mentally ill; (2) whether J.M. was a danger to himself or others; and (3) whether J.M. was a proper subject for treatment by "clear, satisfactory and convincing evidence."[5] Following deliberation, the jury unanimously found that J.M. was mentally ill, a danger to himself or others, and a proper subject for treatment. Based upon these findings, the circuit court ordered a 12-month extension to J.M.'s commitment.

¶25 J.M. then filed a post-disposition motion for a new commitment-extension hearing based on ineffective assistance of counsel, or alternatively, in the interest of justice. J.M. contended that his trial counsel was ineffective because his trial counsel failed to arrange to have J.M. appear in civilian clothing and failed to request a jury instruction directing that J.M.'s status as a prisoner had no bearing on the commitment-extension proceeding.[6] Alternatively, J.M. requested a new trial

---

[5] The petitioner, the County in the instant case, has the burden of proving all required facts by clear and convincing evidence. Wis. Stat. § 51.20(13)(e).

[6] The motion alleged that J.M.'s trial counsel called the Wisconsin Resource Center about obtaining civilian clothes for J.M to wear during trial, but for some unknown reason, J.M.'s counsel did not follow up on the matter.

8

under Wis. Stat. § 751.06 because his appearance in prison garb distracted the jury from the real controversy at hand.

¶26 The circuit court concluded that J.M. had not satisfied the two-prong test set forth in Strickland v. Washington, 466 U.S. 668 (1984), to establish ineffective assistance of counsel. Also applying the Strickland test, the court of appeals affirmed the order of the circuit court, holding in part that even if his trial counsel's performance was deficient, J.M. was not prejudiced by counsel's allegedly deficient performance. For the reasons set forth, we affirm the decision of the court of appeals.

II

¶27 We first address whether the grant of a statutory right to counsel in Wis. Stat. § 51.20(3) is a grant of a right to effective assistance of counsel. We determine this question of statutory interpretation independently of the circuit court and court of appeals, In re Commitment of Franklin, 2004 WI 38, ¶5, 270 Wis. 2d 271, 677 N.W.2d 276, and conclude that § 51.20(3) grants a right to effective assistance of counsel.

¶28 Next, we address the legal standard to be applied for evaluating the ineffective assistance of counsel claim in this Chapter 51 proceeding. Determining the legal standard for evaluating an ineffective assistance of counsel claim is a question of law that an appellate court decides independently, benefiting from the analyses of other courts. See Megal Dev. Corp. v. Shadof, 2005 WI 151, ¶8, 286 Wis. 2d 105, 705

N.W.2d 645;  State  v.  McCallum,  208  Wis. 2d 463,  474-75,  561 N.W.2d 707 (1997).

¶29  We conclude, as did the court of appeals, that the applicable standard for evaluating the ineffective assistance of counsel claim in the instant case is the two-prong standard announced in Strickland v. Washington, 466 U.S. 668 (1984):  A movant must demonstrate that counsel's performance was deficient and that the movant was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 687.

¶30  The first prong of Strickland requires the movant to show specific acts or omissions by counsel that fall "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690.

¶31  The second prong of Strickland requires the movant to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Strickland, 466 U.S. at 694.[7]  In some cases the

---

[7] The standard announced in Strickland v. Washington, 466 U.S. 668 (1984), has not been modified or supplanted.  See Glover v. United States, 531 U.S. 198, 203 (2001) ("[O]ur holding in Lockhart [v. Fretwell, 506 U.S. 364 (1993),] does not supplant the Strickland analysis.").

The Strickland analysis has frequently been applied in Wisconsin cases.  See, e.g., State v. Dillard, 2014 WI 123, ¶95, 358 Wis. 2d 543, 573, 859 N.W.2d 44; State v. Domke, 2011 WI 95, ¶41, 337 Wis. 2d 268, 805 N.W.2d 364 (citing State v. Carter); State v. Carter, 2010 WI 40, ¶23, 324 Wis. 2d 640, 782 N.W.2d 695.

court has stated that the Strickland test for prejudicial performance by counsel is whether counsel committed errors that were so serious "as to deprive the defendant of a fair trial, a trial whose result is reliable."[8] If J.M. does not show that a reasonable probability exists that the result of the proceeding would be different (i.e., that he was deprived of a fair trial whose result is reliable), the court need not determine whether the performance was deficient. Strickland, 466 U.S. at 697. We conclude that the second prong of Strickland (the prejudice prong) has not been met in the instant case.

¶32 A claim of ineffective assistance of counsel under Strickland is a mixed question of fact and law: findings of fact will not be disturbed unless they are clearly erroneous, but the ultimate determination of whether trial counsel's performance was deficient and whether the movant suffered prejudice are questions of law that an appellate court determines independently. State v. Carter, 2010 WI 40, ¶19, 324 Wis. 2d 640, 782 N.W.2d 695. We conclude that J.M. failed to show that a reasonable probability exists that the result of the proceeding would be different. He cannot show that he was deprived of a fair trial whose result is reliable.

¶33 Finally, whether to grant a party a new trial in the interest of justice, the third question presented, is a question that an appellate court decides independently, benefiting from

---

[8] Strickland, 466 U.S. at 687; State v. Jenkins, 2014 WI 59, ¶37, 355 Wis. 2d 180, 848 N.W.2d 786.

the analyses of other courts that have considered the issue. Morden v. Cont'l AG, 2000 WI 51, ¶88, 235 Wis. 2d 325, 611 N.W.2d 659. We conclude that a new trial in the interest of justice is not warranted.

### III

¶34 The first issue presented is whether the grant of a statutory right to counsel in Wis. Stat. § 51.20(3) is a grant of a statutory right to effective counsel and, if so, whether a claim of ineffective assistance of counsel should be evaluated using the Strickland standard. We conclude that § 51.20(3) grants a statutory right to effective counsel and that the Strickland standard applies to J.M.'s claim of ineffective assistance of counsel in the instant Chapter 51 proceeding.

¶35 To determine whether Wis. Stat. § 51.20(3) grants a right to effective counsel in Chapter 51 involuntary commitment proceedings, we look to the language of the statute. Pursuant to Wis. Stat. § 51.20(3), "the court shall assure that the subject individual is represented by adversary counsel" at the time of the filing of the petition for commitment.[9] This court has concluded that when the legislature provides the right to be

---

[9] Wisconsin Stat. § 51.20(3) provides:

(3) Legal counsel. At the time of the filing of the petition the court shall assure that the subject individual is represented by adversary counsel by referring the individual to the state public defender, who shall appoint counsel for the individual without a determination of indigency, as provided in s. 51.60.

12

"represented by counsel," the legislature intends that right to include _effective_ assistance of counsel. See _In re M.D.(S)._, 168 Wis. 2d 995, 1004, 485 N.W.2d 52 (1992). Accordingly we conclude that § 51.20(3) establishes a statutory right to _effective_ assistance of counsel.[10]

¶36 Next, we must determine the standard to apply to the claim of ineffective assistance of counsel in the instant Chapter 51 proceeding. J.M. proposes a modified _Strickland_ standard, essentially arguing that prejudice should be presumed upon a showing of deficient performance.

¶37 Strong legal support exists for our denying J.M.'s proposal and instead applying the _Strickland_ analysis in the instant Chapter 51 proceeding.

¶38 First, the liberty interests of a movant at stake in the involuntary commitment proceeding are similar to the liberty interests of a movant in criminal proceedings. The similarity of liberty interests involved in these proceedings, namely that an institutionalized person is subject to state control and direction (here medical treatment) that the institutionalized person claims is not warranted under the law, supports applying the same standards for evaluating ineffective assistance of counsel claims in criminal proceedings and in involuntary commitment proceedings.

---

[10] Winnebago County agrees with J.M. and the court of appeals that the right to counsel necessarily includes the right to effective assistance of counsel.

13

¶39 Second, the court has applied the Strickland standard in other cases involving important liberty interests. For example, the court has applied Strickland to ineffective assistance of counsel claims in involuntary termination of parental rights cases. See In re M.D.(S)., 168 Wis. 2d at 1003 (citing Santosky v. Kramer, 455 U.S. 745, 763-64 (1982)).[11]

¶40 Third, the Strickland standard has been known to and applied by both the bench and the bar for more than 30 years. Strickland, 466 U.S. 668 (1984); State v. Harvey, 139 Wis. 2d 353, 407 N.W.2d 235 (1987) (adopting Strickland). Thus,

---

[11] In Santosky v. Kramer, 455 U.S. 745 (1982), the United States Supreme Court recognized the formidable task faced by parents in defending themselves against the involuntary termination of their parental rights:

> The State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense. No predetermined limits restrict the sums an agency may spend in prosecuting a given termination proceeding. The State's attorney usually will be expert on the issues contested and the procedures employed at the factfinding hearing, and enjoys full access to all public records concerning the family. The State may call on experts in family relations, psychology, and medicine to bolster its case. Furthermore, the primary witnesses at the hearing will be the agency's own professional caseworkers whom the State has empowered both to investigate the family situation and to testify against the parents. Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination.

Santosky, 455 U.S. at 763-66.

the Strickland standard would be easier for the bench and bar to apply in a variety of cases than a new standard.

¶41 Fourth, the Strickland standard carries with it a developed body of case law that will aid courts in the efficient and timely resolution of claims of ineffective assistance of counsel. See In re Henry B., 159 A.3d 824, 827 (Me. 2017) (noting the advantages of applying the Strickland standard to involuntary commitment proceedings).

¶42 Also, despite Strickland's roots in criminal proceedings, this court[12] and courts in other jurisdictions[13] have not limited Strickland to criminal cases. Our decision to apply the Strickland standard to resolve claims of ineffective assistance of counsel in commitment proceedings is in accord with jurisdictions that have considered the issue.

¶43 Indeed, neither the parties nor our research has revealed any jurisdiction that currently applies a standard

---

[12] See, e.g., In re M.D.(S)., 168 Wis. 2d 995, 1004, 485 N.W.2d 52 (1992) (applying Strickland to ineffective assistance of counsel claims in termination of parental rights cases); In re Commitment of Thayer, 2001 WI App 51, ¶14, 241 Wis. 2d 417, 626 N.W.2d 811 (applying Strickland to a claim of ineffective assistance of counsel in a ch. 980 civil commitment proceeding).

[13] See, for example, the following cases applying Strickland in commitment proceedings: Pope v. Alston, 537 So. 2d 953, 956-57 (Ala. Civ. App. 1988); Matter of Carmody, 653 N.E.2d 977, 983-84 (Ill. App. Ct. 1995); Jones v. State, 477 N.E.2d 353, 356-357 (Ind. Ct. App. 1985); In re B.T.G., 784 N.W.2d 792, 799 (Iowa Ct. App. 2010); In re Henry B., 159 A.3d 824, 827 (Me. 2017); Matter of J.S., 401 P.3d 197, ¶¶18-19 (Mont. 2017); In re Protection of H.W., 85 S.W.3d 348, 355-56 (Tex. App. 2002); Matter of Chapman, 796 S.E.2d 843, 849-50 (S.C. 2017).

15

different than <u>Strickland</u> to claims of ineffective assistance of counsel in commitment proceedings.[14]

¶44 In contrast, the modified <u>Strickland</u> standard proposed by J.M. could encourage the proliferation of ineffective assistance of counsel challenges and delay the permanency necessary to stabilize a mentally ill individual's treatment in a safe environment. <u>See, e.g.</u>, <u>In re Henry B.</u>, 159 A.3d at 827.

¶45 Accordingly, we adopt the <u>Strickland</u> standard for ineffective assistance of counsel claims raised in Chapter 51 involuntary commitment proceedings.

IV

¶46 We next determine whether in the instant case J.M. is entitled to a new commitment-extension proceeding on the ground of ineffective assistance of counsel. We conclude that J.M. is not entitled to a new commitment-extension proceeding because he has not demonstrated that he was prejudiced by his trial counsel's allegedly deficient performance.

¶47 In order to be entitled to a new trial, J.M. must satisfy the two-prong test announced in <u>Strickland</u>. First, J.M. must show that trial counsel's performance was so poor as to

---

[14] In <u>In re Mental Health of K.G.F.</u>, 29 P.3d 485 (Mont. 2001), the Montana Supreme Court rejected the <u>Strickland</u> standard in civil commitment proceedings and instead applied a five-factor analysis to determine whether counsel had provided effective assistance. This case has since been overruled and the Montana Supreme Court now applies the <u>Strickland</u> standard to ineffective assistance of counsel claims in civil commitment proceedings. <u>Matter of J.S.</u>, 401 P.3d 197 (Mont. 2017).

deny him effective counsel. Strickland, 466 U.S. at 687. This prong requires a showing of specific acts or omissions by counsel that fall "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690.

¶48 Second, J.M. must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

¶49 A reasonable probability under the Strickland prejudice prong is a probability sufficient to undermine confidence in the outcome. Strickland, 466 U.S. at 694. This statement of the prejudice prong corresponds with another oft-quoted statement from Strickland about the prejudice prong, namely that the defendant was prejudiced if he or she was deprived of a fair trial whose result is reliable. Strickland, 466 U.S. at 694.

¶50 Because J.M. has not shown he was prejudiced by trial counsel's performance, this court need not determine whether counsel's performance was deficient.

¶51 J.M. argues that his trial counsel was ineffective during trial for not objecting to J.M.'s appearance in prison garb and to "other references" to J.M.'s status as an inmate, and for failing to request a curative instruction. In support of this claim, J.M. relies on cases that indicate that constant

17

reminders to the jury that the defendant is an inmate undermine fair fact-finding and due process.[15]

¶52 The key case upon which J.M. relies is Estelle v. Williams, 425 U.S. 501 (1976), in which the United States Supreme Court explained that the accused's prisoner status may be a continuing unfair influence on a jury:

> [T]he constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment. The defendant's clothing is so likely to be a continuing influence throughout the trial that, not unlike placing a jury in the custody of deputy sheriffs who were also witnesses for the prosecution, an unacceptable risk is presented of impermissible factors coming into play.

Estelle, 425 U.S. at 504-05.

¶53 J.M. highlights this language from Estelle because it suggests that a defendant's clothing alone could constitute prejudice. In the instant case, not only did J.M. wear prison garb during the proceeding, but he was accompanied by uniformed

---

[15] See, e.g., Holbrook v. Flynn, 475 U.S. 560, 569 (1986) ("[T]he sight of a security force within the courtroom might under certain conditions 'create the impression in the minds of the jury that the defendant is dangerous or untrustworthy.'") (quoted source omitted); People v. Hernandez, 247 P.3d 167, 173 (Cal. 2011) (while a deputy standing by a defendant on a witness stand is not a "human shackle," it is potentially prejudicial); State v. Champlain, 2008 WI App 5, ¶22, 307 Wis. 2d 232, 744 N.W.2d 889 (a defendant cannot be compelled to appear before a jury wearing an armband taser).

J.M. also relies upon an opinion by the Wisconsin Attorney General that the same principles that govern ineffective assistance of counsel claims in criminal proceedings should apply to Chapter 51 proceedings as well. 71 Wis. Op. Att'y Gen. 183, 184-85 (1982) (OAG 58-82).

guards during the proceeding and while he was on the witness stand.

¶54 We conclude that J.M. failed to demonstrate that a reasonable probability exists that the result of his Chapter 51 commitment-extension proceeding would have been different had trial counsel's conduct not been deficient as alleged. We therefore need not decide whether counsel's alleged deficiencies constitute deficient performance under Strickland.

¶55 In determining whether there is a reasonable probability of a different result, the reviewing court considers all the evidence in the record. Strickland, 466 U.S. at 695. The court of appeals accurately described the evidence as overwhelmingly in favor of continuing J.M.'s commitment. Winnebago Cnty. v. J.M., No. 2016AP619, unpublished slip op., ¶16 (Wis. Ct. App. Nov. 9, 2016).[16]

¶56 At the commitment-extension proceeding, two medical doctors specializing in psychiatry, Dr. Bales and Dr. Waedekin, testified in support of extending J.M.'s commitment. Both doctors were of the opinion "to a reasonable degree of medical certainty" that (1) J.M. was mentally ill; (2) J.M. was a danger to himself or others; and (3) J.M. was a proper subject for treatment. The experts based their opinions on personal interactions with J.M. as well as reviews of his treatment

---

[16] "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696.

19

history and records. See supra ¶¶16-22 (describing the medical testimony).

¶57 In contrast, J.M. presented no countervailing expert testimony to rebut the opinions of Dr. Bales or Dr. Waedekin. Instead, J.M. testified on his own behalf. J.M. testified that he was not mentally ill or dangerous, that he had calmed down, and that the County's experts' conclusions were "opinions, not facts." J.M. also testified that he identifies as "Jesus the Lord" and has the ability to damn people.

¶58 Further, both doctors shared experiences of their interactions with J.M. that contradicted J.M.'s testimony that he was no longer a danger to himself or others and that he had calmed down. Dr. Bales testified to terminating his evaluation of J.M. early because J.M.'s reactions caused him to fear for his safety. This evaluation occurred just one day prior to the commitment-extension proceeding. Dr. Waedekin also testified to being the subject of a menacing and threatening outburst that included being yelled at and "damned" by J.M. when she met with J.M. to advise him that an extension of his commitment was being requested.

¶59 To prevail in the instant commitment-extension proceeding and obtain a continuation of J.M.'s confinement, Winnebago County had to prove by clear and convincing evidence that J.M. was (1) mentally ill; (2) a danger to himself or others; and (3) a proper subject for treatment. Wis. Stat. § 51.20(1)(a), (13)(e).

¶60 The jurors were instructed to determine a witness's credibility based on the witness's conduct, appearance, and demeanor on the witness stand and all other facts and circumstances. No reasonable jurors would have thought that the jury instructions directed them to base their credibility assessment on J.M.'s clothing. Although in-person evaluation of witness credibility is important, we are not persuaded that the jury would have given different credence to J.M.'s testimony had he not worn prison garb.

¶61 Given the testimony presented by the County and J.M., the jury's findings that J.M. was mentally ill, a danger to himself or others, and a proper subject for treatment were well-supported by the evidence. The evidence presented by Winnebago County supporting its position was overwhelming. J.M. is unable to demonstrate a reasonable probability that the result of the proceeding would have been different but for his trial counsel's allegedly deficient performance.

V

¶62 Lastly, we determine whether J.M. is entitled to a new commitment-extension proceeding in the interest of justice under Wis. Stat. § 751.06.

¶63 Wisconsin Stat. § 751.06 permits this court to order a new trial "if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried . . . ." Wis. Stat. § 751.06. This court's discretionary power pursuant to Wis. Stat. § 751.06 is to be "exercised sparingly and with great

21

caution." State v. Watkins, 2002 WI 101, ¶79, 255 Wis. 2d 265, 647 N.W.2d 244.

¶64 J.M. contends that because the jury received contradictory instructions on the burden of proof and because J.M. was in prison attire, the real controversy was not tried in the instant case.

¶65 Before opening statements, the circuit court erroneously told the jury that Winnebago County was required to prove its case by the "greater weight of the credible evidence." No one pointed out the mistake. At the end of testimony, immediately prior to jury deliberations, the circuit court orally correctly instructed the jury that Winnebago County had to prove all facts by "clear and convincing evidence." The correct standard was also included in the written jury instructions; the circuit court is required to submit the written jury instructions to the jury. Wis. Stat. § 805.13(4). Under these circumstances, the conflicting jury instructions fail to raise sufficient qualms about the commitment-extension proceeding to justify this court's use of its discretionary power under Wis. Stat. § 751.06.

¶66 Furthermore, as we explained above, J.M. was not prejudiced by his wearing of prison garb during his commitment-extension proceeding.

¶67 Accordingly, nothing in the record supports J.M.'s contention that the court should exercise its discretionary power under Wis. Stat. § 751.06 to grant a new trial on the

22

ground that the real controversy was not fully tried. The real controversy was fully tried.

\* \* \* \*

¶68 For the reasons set forth, we conclude that J.M. is not entitled to a new Chapter 51 commitment-extension proceeding.

¶69 The legislature has granted a right to effective assistance of counsel in the Chapter 51 commitment-extension proceeding at issue. Wis. Stat. § 51.20(3). The Strickland standard is the correct standard to apply to the claim of ineffective assistance of counsel. J.M. did not demonstrate that he was prejudiced by trial counsel's allegedly deficient performance.

¶70 Accordingly, we affirm the court of appeals' decision that J.M.'s post-disposition motion was properly dismissed.

*By the Court*.—The decision of the court of appeals is affirmed.

¶71 ANN WALSH BRADLEY, J. *(concurring).* I agree with the majority that the <u>Strickland</u> standard should be applied to ineffective assistance of counsel claims in ch. 51 involuntary commitment proceedings. I further agree that the evidence is "overwhelmingly in favor of continuing J.M.'s commitment." Majority op., ¶55. Accordingly, I also conclude that "J.M. is unable to demonstrate a reasonable probability that the result of the proceeding would have been different but for his trial counsel's allegedly deficient performance." <u>Id.</u>, ¶61.

¶72 However, I write separately to caution counsel in ch. 51 cases regarding the effect that prison garb and uniformed guards may have on such a proceeding. There is a dearth of case law surrounding ineffective assistance of counsel in the context of ch. 51 proceedings, making further guidance to the bench and bar alike beneficial. Indeed, this case represents our first announcement that a potential ch. 51 committee is entitled to the effective assistance of counsel in the first instance.

¶73 For the reasons set forth below, I urge ch. 51 counsel to be mindful of the unique effect that prison garb and uniformed officers could have on a proceeding where "dangerousness" is an element the county must prove.

¶74 Although J.M.'s counsel had asked the Wisconsin Resource Center to ensure J.M. appeared for trial in civilian clothing, it failed to do so. Despite J.M. being clothed in his prison uniform, counsel allowed the trial to continue without objection. Majority op., ¶12.

1

¶75 The United States Supreme Court has recognized that prison uniforms are "so likely to be a continuing influence throughout the trial that, not unlike placing a jury in the custody of deputy sheriffs who were also witnesses for the prosecution, an unacceptable risk is presented of impermissible factors coming into play." Estelle v. Williams, 425 U.S. 501, 505 (1976).

¶76 Prison clothing is an "unmistakable indication[] of the need to separate a defendant from the community at large." Holbrook v. Flynn, 475 U.S. 560, 569 (1986). It is "a sign that [a person] is particularly dangerous or culpable." See id. Such attire thus sends a strong signal to a jury not only that a person is criminally guilty, but that a person is dangerous.

¶77 In addition to wearing prison clothing, J.M. was accompanied throughout trial by two uniformed guards from the Department of Corrections. See majority op., ¶12. "[T]he sight of a security force within the courtroom might under certain conditions create the impression in the minds of the jury that the defendant is dangerous or untrustworthy." Holbrook, 475 U.S. at 569 (internal quotation omitted).

¶78 The uniformed officers did not merely guard J.M. in the courtroom during the proceedings, but also flanked J.M. even as he testified from the witness stand. See majority op., ¶53. The image of this guarded closeness has the potential to prejudice the jury. See People v. Hernandez, 247 P.3d 167, 173-74 (Cal. 2011) (explaining that although a deputy standing by a

defendant on the witness stand is not a "human shackle," it is potentially prejudicial to the jury).

¶79 The facts alleged here give rise to the "certain conditions" forewarned in Holbrook. The combination of prison clothing and uniformed officers standing guard next to the witness stand may leave "the impression in the minds of the jury that the defendant is dangerous." See Holbrook, 475 U.S. at 569.

¶80 These facts are particularly potent because dangerousness is an element that the county must prove in a ch. 51 commitment proceeding.[1] In re Helen E.F., 2012 WI 50, ¶20, 340 Wis. 2d 500, 814 N.W.2d 179; Wis. Stat. § 51.20(1)(a)1.-2. When a person subject to a ch. 51 proceeding appears before the jury surrounded by uniformed guards and wearing prison garb, the dangerousness element could be established without a word from the county's attorney. One look at a person in this condition may create a clear subtext: this man is dangerous.

¶81 Accordingly, although I join the majority opinion, I write separately to call attention to counsel's obligations in ch. 51 proceedings. I urge counsel to be mindful of the potentially harmful effects of prison garb and uniformed guards when "dangerousness" is an element that must be proven.

¶82 For the foregoing reasons, I respectfully concur.

---

[1] In order to be subject to involuntary commitment pursuant to ch. 51, an individual must be (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous to themselves or to others. In re Helen E.F., 2012 WI 50, ¶20, 340 Wis. 2d 500, 814 N.W.2d 179; Wis. Stat. § 51.20(1)(a)1.-2.

3