**COURT OF APPEALS
DECISION
DATED AND FILED**

**May 1, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1798**

STATE OF WISCONSIN

Cir. Ct. No. 2023ME32

IN COURT OF APPEALS
DISTRICT II

---

IN THE MATTER OF THE MENTAL COMMITMENT OF A.F.H.:

WINNEBAGO COUNTY,

    PETITIONER-RESPONDENT,

  V.

A.F.H.,

    RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Winnebago County: TERESA S. BASILIERE and MICHAEL S. GIBBS, Judges. *Affirmed*.

¶1     LAZAR, J.[1]  Antonin[2] appeals from an order of commitment, an order for involuntary medication and treatment, and an order denying postcommitment relief based on his allegation of ineffective assistance of counsel at his final involuntary commitment hearing.  He alleges that his trial counsel failed to object to hearsay testimony regarding dangerousness and that, excluding the inadmissible hearsay, Winnebago County failed to offer sufficient evidence of current dangerousness for the court to order Antonin's commitment under WIS. STAT. § 51.20.  This court concludes that the County's evidence of current dangerousness was sufficient even excluding the alleged hearsay.  The orders are therefore affirmed.

## BACKGROUND

¶2     Antonin was incarcerated and placed in the Wisconsin Resource Center ("WRC")[3] when the County filed a petition seeking his civil commitment and involuntary medication and treatment on January 26, 2023.  After finding that probable cause existed on February 6, the court commissioner ordered that Antonin be examined and set a final hearing for February 16, 2023.  Witnesses at the hearing included Dr. George Monese, a psychiatrist at WRC who had treated

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(d) (2021-22).  All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] In order to protect his confidentiality, this court refers to the subject individual by the pseudonym he selected.  *See* WIS. STAT. RULE 809.19(1)(g).

[3] The WRC is "a correctional institution that provides psychological evaluations, specialized learning programs, training and supervision for inmates whose behavior presents a serious problem to themselves or others in state prisons."  WIS. STAT. § 46.056.  It is located in Winnebago County.

Antonin as a patient since 2017; Michael Natzke, a psychiatric care supervisor at WRC; and Antonin himself.

¶3    Monese testified that Antonin suffers from schizoaffective disorder, a major mental illness that grossly impairs Antonin's judgment, behavior, and recognition of reality. When asked about Antonin's dangerousness, Monese recounted behavior from the month before that was documented in Antonin's medical records (which Monese said he also "discussed … with him"): Antonin "threatened the staff that he was going to kill them, injure them, or do them physical harm" and "spat at one of the staff members directly" (albeit with a glass window separating the individuals). Based on Antonin's history of starting and stopping medication voluntarily and the fact that "when he [didn't] take [his medications], he became more psychotic to the extent that he threatened other staff members," Monese was requesting authorization to involuntarily medicate Antonin with psychotropic medication. No reports from either Monese or the two other experts who had been ordered to evaluate Antonin were moved into evidence.

¶4    Antonin's trial counsel did not object to any of Monese's testimony. On cross-examination, she asked whether Antonin acknowledged to Monese any of "those situations from January." Monese responded: "He did not acknowledge—he did not want me to discuss, specifically, he said disorganization, but that the other instances regarding the dangerousness, those were discussed with him just at a time when we were filing the petition." Monese also noted that since Antonin was back on medication, he was "like a normal person" and "doing very well."

¶5      Natzke began his testimony by describing his interaction with Antonin that occurred on December 29, 2022, when Natzke was working at the WRC.  During a meeting, he and other staff were "notified that [Antonin] had a cup of unknown liquid."  After responding to a clarifying question from the trial court about what it was that Antonin had, he further testified that Antonin "was threatening to throw [the cup of liquid] at a staff member."  Natzke went to Antonin's door to "notify him of a security precaution" and, because Antonin was whispering, moved closer to the door.  Antonin then "spit right at the window directly in [Natzke's] eyes."  The window glass prevented Natzke from being struck.  After that incident, Natzke testified that staff implemented the security precaution of wearing spit masks when interacting with Antonin.  Counsel for Antonin did not cross-examine Natzke or object to any of his testimony.

¶6      Finally, Antonin testified.  He denied ever spitting at or threatening anyone.  He stated that Natzke's testimony was "a lie."  He asked his own counsel whether she was "badgering" him when she questioned him about whether the spitting incident had actually happened.  He also denied having any mental health issues.   On cross-examination, the County asked Antonin about various interactions with WRC staff, including an instance of threatening to throw urine on a staff member, all of which Antonin denied.

¶7      The trial court[4] determined that the County had proven grounds for commitment.  Relying on evidence of "the spitting, the threatening to spit or throw

_____

[4] The Honorable Teresa S. Basiliere, hereinafter the "trial court," presided over the commitment proceeding and issued the orders for commitment and the involuntary administration of medication and treatment.  The Honorable Michael S. Gibbs, hereinafter the "circuit court," presided over the postcommitment motion hearing.

urine, and the threat to kill," it concluded that Antonin was dangerous under WIS. STAT. § 51.20(1)(a)2.b. because he posed "a substantial probability of physical harm to others." In addition to a six-month commitment, the court ordered involuntary medication and treatment for Antonin.

¶8      With new counsel, Antonin filed a motion for postcommitment relief in early August 2023. He asserted that his trial counsel was ineffective in failing to object to hearsay testimony of Monese at the final hearing and that, without that erroneously admitted hearsay evidence, the County offered insufficient evidence of dangerousness for commitment. At a September 7, 2023[5] *Machner*[6] hearing on this motion, Antonin's trial counsel testified that she elected not to object to Monese's dangerousness testimony on hearsay grounds because the facts to which he testified were contained in "regularly-kept records that the doctor was reviewing and giving his opinion on" and that when she had made similar objections in past proceedings she was told that "those are regularly-kept records, they're going to be allowed in."

¶9      She further testified that, when she was representing Antonin, she was "[n]ot off-the-cuff" aware of either *Walworth County v. Therese B.*, 2003 WI App 223, ¶9, 267 Wis. 2d 310, 671 N.W.2d 377 (holding that an expert witness cannot be used "solely as a conduit for the hearsay opinions of others"), or *S.Y. v. Eau Claire County*, 156 Wis. 2d 317, 327-28, 457 N.W.2d 326 (Ct. App. 1990), *aff'd*, 162 Wis. 2d 320, 469 N.W.2d 836 (1991) (stating that expert's testimony

---

[5] The hearing was after Antonin's commitment and involuntary administration of medication and treatment orders had expired.

[6] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

about an event not witnessed by the expert was inadmissible to prove dangerousness, although the error was deemed harmless).

¶10 With respect to Natzke's testimony,[7] trial counsel was questioned as follows:

> Q. He testified, quote, "So we were in a cross shift with our treatment team, we were notified that…" it goes on discussing an unknown or a cup of unknown liquid. So when Mr. Natzke said, "We were notified that," end quote, did you object to hearsay at that point?
>
> A. I don't believe I did.
>
> Q. After he completed the sentence and talked about this incident with a cup of unknown liquid, did you object at all then?
>
> A. I don't think I did at that point either.

---

[7] Antonin did not raise any issue regarding Natzke's testimony in his initial brief in support of his postcommitment motion. He included three lines in his reply brief suggesting that Natzke "never testified that he had personal knowledge of Antonin threatening to" "spit onto a person directly" and that "he was 'notified' by others" about this—thus, according to Antonin, Natzke's testimony about Antonin's threats to spit on a person "is also hearsay." This mischaracterizes Natzke's testimony at the final hearing, which was that he was "notified that [Antonin] had a cup of unknown liquid," not notified about any threats to spit on a person. After the circuit court's clarifying question about what was in the cup, Natzke testified that "[Antonin] was threatening to throw [the unknown liquid] at a staff member."

To the extent Antonin forfeited his argument that Natzke's testimony about Antonin's threat to throw liquid at a staff member was hearsay and that trial counsel was ineffective for failing to object to it by failing to raise the issue in the circuit court, *see, e.g.*, **Oneida County v. WERC**, 2000 WI App 191, ¶24, 238 Wis. 2d 763, 618 N.W.2d 891, the County does not assert forfeiture. Instead, it argues that the testimony was not hearsay or was admissible because it falls under a hearsay exception. This has little practical effect given this court's conclusion that the direct testimony about Antonin spitting at Natzke, which Antonin concedes is admissible, is sufficient to prove dangerousness and makes it unlikely that the outcome of his hearing would have been different even if an objection had been sustained.

When asked whether she had "a strategic reason for not objecting to that testimony" she said, "[a]gain, we were looking at records from the facility that we regularly look at."

¶11    On cross-examination, trial counsel testified that she did not think objecting to the testimony at issue would have made a difference to the outcome of Antonin's case given the strength of the County's evidence that Antonin had spit at Natzke, which, she stated, is "dangerous in today's day and age, and [she knew] that they were going to have that witness … being called to testify, [who] had personal knowledge of dangerousness there."  At that point, Antonin interrupted the proceedings, first telling his attorney to "[g]et away" and then repeatedly telling the court, among other things, "[s]hut up talking to me."  After Antonin left the courtroom, trial counsel testified that she knew Antonin intended to testify at his final hearing and that his testimony would contradict everything the other witnesses had said regarding his mental illness and the events that had taken place. She identified the "issue with recency" as the lone strength of Antonin's case, but acknowledged that "it was very difficult" and that "[i]t was … uphill in terms of trying to establish [a] defense there."

¶12    The circuit court denied Antonin's motion.  It found that Monese's testimony "contained items of hearsay" and explained that although an "expert can rely on such hearsay for forming [his] opinions, … [it] cannot be the basis for the underlying dangerousness."  The court did not make a finding with respect to any alleged hearsay in Natzke's testimony.  It found, however, that Natzke's direct testimony recounting the December 29 incident in which Antonin spat at him (albeit separated by the glass of Antonin's cell door) was "certainly enough testimony … to establish dangerousness."  Thus, the court concluded that

Antonin's trial counsel had not rendered ineffective assistance at his final hearing and denied the postcommitment motion.

¶13    Antonin appeals. He does not contest the trial court's determinations that he is mentally ill and a proper subject for treatment, both of which are required for ordering commitment under WIS. STAT. § 51.20(1)(a) and involuntary medication and treatment under WIS. STAT. § 51.61(1)(g)3. He contests only the court's determination of current dangerousness, again asserting that absent inadmissible hearsay, the County offered insufficient evidence on this point. He points to three factual findings on which the trial court relied in determining that he was dangerous to others pursuant to § 51.20(1)(a)2.b.:   "(1) 'the spitting,' (2) 'the threatening to spit or throw urine,' and (3) 'the threat to kill.'" He says the second and third of these should be disregarded because they were solely based on hearsay testimony. He further argues that his trial counsel's failure to object to the alleged hearsay supporting these factual findings constituted ineffective assistance, contrary to the circuit court's ruling on his postcommitment motion for relief. Antonin also makes an argument on the timing issue he sees with the evidence, asserting that the County offered only evidence of an incident that occurred forty-nine days before the final hearing and did not prove that he was dangerous at the time commitment was ordered. *See* § 51.20(1)(a)2.b. (requiring "evidence of *recent* homicidal or other violent behavior" or "evidence[ of] a *recent* overt act" that places others "in reasonable fear" (emphases added)).

## DISCUSSION

### I.    Ineffective assistance of counsel

¶14    Our supreme court, in **Winnebago County v. J.M.**, 2018 WI 37, ¶7, 381 Wis. 2d 28, 911 N.W.2d 41, held that individuals subject to involuntary

8

commitment proceedings have a right to effective assistance of counsel and that the remedy for ineffective assistance is a new trial, *see id.*, ¶47.[8]  The *Strickland* standard applies in evaluating a claim of ineffective assistance in such cases.  *See J.M.*, 381 Wis. 2d 28, ¶34 (adopting standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), in WIS. STAT. ch. 51 proceedings).  Pursuant to this standard, it is the subject individual's burden to satisfy a two-prong test:  he must show both that trial counsel's performance was deficient (falling "outside the wide range of professionally competent assistance") and that he was prejudiced by the performance ("that, but for counsel's unprofessional errors, the result of the proceeding would have been different").  *J.M.*, 381 Wis. 2d 28, ¶¶47-48 (quoting *Strickland*, 466 U.S. at 690, 694).  On review, we will not overturn the trial court's factual findings unless they are clearly erroneous.  *State v. Demmerly*, 2006 WI App 181, ¶21, 296 Wis. 2d 153, 722 N.W.2d 585.  Whether counsel was deficient and whether the defendant was prejudiced are questions of law this court reviews de novo.  *Id.*

¶15     If a court finds that one prong of the *Strickland* test is not satisfied, it need not analyze the other.  *See J.M.*, 381 Wis. 2d 28, ¶50.  Here, it makes sense to begin with the prejudice prong; Antonin can succeed only if he shows "a reasonable probability" that the outcome of his commitment case would have been different had his counsel objected to the alleged hearsay.  *See id.*, ¶48 (citation omitted).  Thus, Antonin says that "the real question" that must be answered is whether Antonin's spitting incident alone can be deemed dangerous under WIS.

---

[8] Although Antonin argues that his trial counsel was ineffective, he does not explicitly ask this court to order a new trial—perhaps because the involuntary commitment and medication orders at issue have expired.  Instead, as addressed below, he asks only for reversal of the orders.

STAT. § 51.20(1)(a)2.b. because the other two facts set forth to establish dangerousness were derived from hearsay testimony that was allegedly only admitted because of his counsel's deficient performance.

¶16 The statute provides that dangerousness to others must be shown in at least one of two ways. The first is with evidence of "homicidal or other violent behavior." WIS. STAT. § 51.20(1)(a)2.b. The second is with evidence of an "overt act, attempt or threat to do serious physical harm" that places others "in reasonable fear of violent behavior and serious physical harm." *Id.* This court agrees with the County that Antonin's spitting at Natzke shows his dangerousness to others at least via the second path.

¶17 The County points out some of the many diseases, some serious or even fatal, that are commonly known to be transmissible via saliva. It also points out that spitting at a prison employee is serious enough on its own to constitute a separate and distinct criminal offense. *See* WIS. STAT. § 946.43(2m). Antonin does not dispute these facts but argues that, in his case, the pane of glass separating the spit from its target meant that he could not have been convicted under § 946.43(2m) (because the required element of intent for the bodily substance to come into contact with the victim could not have been met) and that Natzke could not have been placed in *reasonable* fear of violent behavior and serious harm from Antonin. He further argues that the mitigation measures taken by WRC staff after the incident—the implementation of spit masks, which the County says demonstrates that Natzke did, indeed, fear harm from Antonin— shows that fear of physical harm from Antonin would be objectively unreasonable; WRC had "security and safety measures in place" for its employees to avoid any harm that could come from any further spitting.

¶18     The required showing under WIS. STAT. § 51.20(1)(a)2.b. is that "it is much more likely than not that [Antonin] *will* cause physical harm to other individuals," ***Marathon County v. D.K.***, 2020 WI 8, ¶42, 390 Wis. 2d 50, 937 N.W.2d 901 (emphasis added), not that he did harm others or that recent acts showing his propensity to hurt others were likely to succeed. "[I]n keeping with the legislature's intent to focus upon the mental state of the subject to be examined, not those who may [have been] affected by the subject individual's behavior," ***R.J. v. Winnebago County***, 146 Wis. 2d 516, 521, 431 N.W.2d 708 (Ct. App. 1988), this court has previously analyzed the actions of subject individuals without regard to their likelihood of success—with or without security measures—of causing harm. *See, e.g.*, ***Winnebago County v. T.M.G.***, No. 2023AP1283, unpublished slip op. ¶13 (WI App Jan. 24, 2024)[9] (affirming conclusion of dangerousness based on individual's mailing of a white powder to a federal courthouse despite individual's argument that powder "was likely to be harmless given that he was in prison without access to harmful substances").

¶19     In this case, whether Antonin's spitting is viewed as an actual attempt at harm (doomed by the window protecting his target) or a threat to do future harm (to spit at staff as soon as he got a chance when the window was not between them, for example), it caused enough fear of harm that WRC staff implemented the extra security measure of wearing spit masks when dealing with Antonin. The contention that this security measure was likely to be effective and thus mitigated the fear of potential targets misses the point that Antonin made an attempt or threat sufficient to show dangerousness by the second evidentiary path

_____

[9] Unpublished cases may not be cited for precedential value, but may be cited for persuasive value. *See* WIS. STAT. RULE 809.23(3)(a), (b).

11

of WIS. STAT. § 51.20(1)(a)2.b. The very act of prophylactically wearing spit masks is evidence of the reasonable fear that the staff had for their safety.

¶20   This court does not hold that spitting is necessarily and always a violent act sufficient to satisfy the dangerousness standard of WIS. STAT. § 51.20(1)(a)2.b. But there are many cases listing spitting at a person as factual evidence supporting a determination of dangerousness. *See, e.g.*, ***Winnebago County v. D.E.S.***, No. 2022AP251, unpublished slip op. ¶17 (WI App Aug. 31, 2022); ***Winnebago County v. J.D.J.***, No. 2022AP1357-FT, unpublished slip op. ¶14 (WI App Nov. 23, 2022). The trial court's factual finding that the spitting in this case constituted either an attempt or a threat to do harm is supported by the evidence based on that court's assessment of witnesses (including their credibility and demeanor) and in the context of other evidence (including Monese's testimony regarding Antonin's mental illness and its effects on him). *See **D.K.***, 390 Wis. 2d 50, ¶51 ("[W]e do not review [a witness's] statements in isolation. Rather, we review his testimony and the circuit court's findings as a whole."); *see also **T.M.F. v. Children's Serv. Soc'y of Wis.**,* 112 Wis. 2d 180, 188, 332 N.W.2d 293 (1983) (holding that a circuit court's legal conclusion may be given weight when it is "derived from and intertwined with the [circuit] court's factual inquiry during which the [circuit] court has had the opportunity to question and observe the witnesses").

¶21   Evidence of Antonin's spitting at Natzke is sufficient to support the legal conclusion that Antonin presented a danger to others, and he has not shown that the outcome of his case would be different if the County had offered only this evidence of dangerousness. Thus, there has been no showing of prejudice and Antonin's appeal of the circuit court's postcommitment order rejecting his claim of ineffective assistance of counsel fails.

## II. Hearsay

¶22 As noted, Antonin has not explicitly requested a new trial, which would be his remedy if he had proven ineffective assistance. In his briefing, he asks only for this court "to reverse the circuit court's involuntary commitment and medication orders" and makes a direct attack on the orders based on the circuit court's admission and reliance on the alleged hearsay of both Monese and Natzke. He cites ***Morden v. Continental AG***, 2000 WI 51, ¶81, 235 Wis. 2d 325, 611 N.W.2d 659, and asserts that this court should review the trial court's admission and reliance on this evidence under the erroneous exercise of discretion standard.

¶23 Antonin is mistaken. ***Morden*** discusses review of "a circuit court's evidentiary ruling." ***Id.*** In Antonin's case, there is no evidentiary ruling to review; the trial court did not make a ruling on the admissibility of the testimony at issue from either witness because Antonin did not object to it. The County is correct that in such a case, the argument is normally deemed forfeited. *See **State v. Ndina***, 2009 WI 21, ¶30, 315 Wis. 2d 653, 761 N.W.2d 612 ("[F]ailure to object [at trial] constitutes a forfeiture of the right on appellate review."). "Generally, if a claim is forfeited, we address that claim in the context of ineffective assistance of counsel." ***State v. Counihan***, 2020 WI 12, ¶28, 390 Wis. 2d 172, 938 N.W.2d 530. As discussed above, Antonin did not meet his burden to show ineffective assistance.

¶24 On direct appeal, this court reviews the alleged errors only for plain error. *See* WIS. STAT. § 901.03(4) (allowing appellate court to "tak[e] notice of plain errors affecting substantial rights although they were not brought to the attention of the judge"). Given that the direct evidence of Antonin's spitting at Natzke is sufficient to support a determination of dangerousness, as discussed

above, Antonin has not shown plain error. He fares no better in attacking the orders at issue from this angle.

### III.     Recency of dangerousness

¶25     Antonin's last argument with respect to the sufficiency of the evidence relates to timing. He asserts that the spitting incident was not recent enough; Monese's testimony that Antonin's condition at the final hearing was "like a normal person … very coherent" meant Antonin had "ceased to be actively dangerous" and thus was not "currently dangerous" as required for commitment. *See* WIS. STAT. § 51.20(1)(a)2.b. (requiring "recent" behavior or act to show dangerousness); *Waupaca County v. K.E.K.*, 2021 WI 9, ¶18, 395 Wis. 2d 460, 954 N.W.2d 366 (analyzing the alternative path for proving dangerousness in a recommitment proceeding and noting that initial commitment requires proof of an individual's current dangerousness by recent acts).

¶26     Antonin spat at Natzke on December 29, 2022. Monese drafted a letter requesting civil commitment on January 5, 2023, and the County filed its petition seeking commitment on January 26, less than a month after the spitting incident. The court held a probable cause hearing on February 3 and signed an order for medication that day—medication that was so effective that Monese testified thirteen days later, at the February 16 final hearing, that Antonin had become "like a normal person walking the street" "in the short space of time he's been taking the medications."

¶27     This timeline adheres to the statutory deadlines set out in WIS. STAT. ch. 51 and Antonin cites no case law supporting the notion that the spitting incident was not recent enough to support a dangerousness finding at the final hearing. It would be perverse to hold that commitment and involuntary

medication might be warranted only if the medication properly ordered at the probable cause hearing had been ineffective such that instances of dangerous behavior continued to take place right up to the date of the final hearing. This court finds no merit in Antonin's recency argument.

### IV. Mootness

¶28    Finally, because the involuntary commitment and medication orders at issue expired on August 16, 2023 prior even to the postcommitment motion hearing, the parties have raised the issue of whether Antonin's appeal is moot. Antonin points to the collateral consequences of commitment orders discussed in *Sauk County v. S.A.M.*, 2022 WI 46, ¶¶22-24, 402 Wis. 2d 379, 975 N.W.2d 162, in arguing that it is not:  the firearms ban and liability for the cost of care. This court agrees with the County that these collateral consequences may very well be illusory in a case such as this. First, Antonin was already subject to a firearms ban because of his multiple felony convictions. And second, WRC, which the County asserts does not even have a billing department, purportedly "does not bill patients like Antonin." Nevertheless, pursuant to *S.A.M.*, the case has been analyzed on the merits.

### CONCLUSION

¶29    Antonin's is yet another appeal regarding a commitment proceeding that is not decided until well after the orders at issue are expired and at significant cost of judicial and party resources. As our supreme court articulated in *D.K.*, 390 Wis. 2d 50, ¶55, "[h]ad certain things happened in the circuit court below, perhaps [this] appeal would have been unnecessary. The record was sufficient in this case, but it could have been more detailed." For instance, as in *D.K.*, the reports of the experts ordered to evaluate Antonin could have been moved into evidence. In

15

addition, witnesses who observed the additional evidence of dangerousness discussed by Monese and mentioned in the County's petition for commitment presumably could have been produced.[10] Nevertheless, this court carefully considered the issues presented, and for the foregoing reasons, the orders of the circuit court regarding Antonin's postcommitment motion and involuntary commitment and medication are affirmed.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[10] Allegedly, staff members personally heard threats made by Antonin regarding spitting, throwing personal fluids, and stating an intent to kill staff. These allegations, which should have been introduced via witnesses with personal knowledge, have not been relied upon by this court in this appeal.