COURT OF APPEALS
DECISION
DATED AND FILED

February 21, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal Nos. **2022AP2079**
**2023AP904**
STATE OF WISCONSIN

Cir. Ct. No. 2015ME122

IN COURT OF APPEALS
DISTRICT II

---

No. **2022AP2079**

IN THE MATTER OF THE MENTAL COMMITMENT OF **B.M.T.**:

MANITOWOC COUNTY HUMAN SERVICES DEPARTMENT,

    PETITIONER-RESPONDENT,

  V.

B.M.T.,

    RESPONDENT-APPELLANT.

---

No. **2023AP904**

IN THE MATTER OF THE MENTAL COMMITMENT OF **B.M.T.**:

MANITOWOC COUNTY,

    PETITIONER-RESPONDENT,

  V.

**B.M.T.,**

    **RESPONDENT-APPELLANT.**

---

          APPEALS from orders of the circuit court for Manitowoc County: ROBERT P. DEWANE, Judge. *Affirmed in part; reversed in part.*

    ¶1    GROGAN, J.[1]  B.M.T. appeals the twelve-month WIS. STAT. ch. 51 (hereinafter "ch. 51") extension of his commitment[2] and involuntary medication orders from both 2022 and 2023.[3]  In the 2022 appeal, B.M.T. asserts the circuit court lost competency to enter the extension orders, which he asserts requires reversal of both the 2022 and 2023 commitment and involuntary medication orders.  In the 2023 appeal, B.M.T. makes two arguments:  (1) the circuit court failed to make specific findings on the dangerousness element required by ***D.J.W.***,[4] which warrants reversal; and (2) the County failed to establish that B.M.T. was provided with an explanation of the advantages, disadvantages, and alternative medications, which therefore warrants reversal of the medication order.  This court affirms the orders in the 2022 appeal but reverses the orders in the 2023 appeal.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22).  All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] "[E]xtension of a commitment" and "recommitment" are synonymous, and the terms will therefore be used interchangeably.  ***Sheboygan County v. M.W.***, 2022 WI 40, ¶6 n.3, 402 Wis. 2d 1, 974 N.W.2d 733.

[3] B.M.T. moved to consolidate his appeals from the 2022 and 2023 commitment orders.  This court granted his motion by written order dated May 30, 2023.

[4] ***Langlade County v. D.J.W.***, 2020 WI 41, ¶59, 391 Wis. 2d 231, 942 N.W.2d 277.

## I. BACKGROUND

¶2      B.M.T. has been under a ch. 51 commitment since 2015 and has been diagnosed with schizoaffective disorder.  In January 2022, the County filed a petition to extend commitment orders that were set to expire on February 27, 2022.  B.M.T. contested the petition, and a hearing was set for February 25, 2022.  B.M.T., the County's lawyer (Sarah Belair), and three individuals from the Manitowoc County Human Services Department were present in the courtroom on the February 25th hearing date, and B.M.T.'s lawyer, Luke Harrison, appeared via Zoom.  The following exchange occurred:

> THE COURT:  Matter had been on the calendar today for an extension hearing.  Due to the level of snow we got last night, Attorney Harrison has not been able to make it in to the office.  In anticipation of this, this possibility was apparently discussed with [B.M.T.] prior to this morning, and it's my understanding that -- Attorney Harrison, that your client wishes to stipulate to an extension of the extension hearing so that we can have you here in person.  Is that correct?
>
> MR. HARRISON:  That's correct.
>
> THE COURT:  And, [B.M.T.], that is in fact your request?
>
> [B.M.T.]:  Yes, Your Honor.
>
> THE COURT:  Based on [B.M.T.'s] request and the fact that Attorney Harrison is not able to be with us today, the Court is going to find the necessary cause to extend the hearing until March 8th at 9:00 and that time is good for your office, Attorney Belair?
>
> MS. BELAIR:  Yes, Your Honor.
>
> THE COURT:  And Attorney Harrison?
>
> MR. HARRISON:  Yes, Your Honor.
>
> THE COURT:  And, [B.M.T.], that's good for you as well?

[B.M.T.]: Yes.

THE COURT: Anything else?

MS. BELAIR: Just to clarify, the order and all conditions are being extended until that time?

THE COURT: Correct.

MS. BELAIR: Nothing further.

THE COURT: Attorney Harrison?

MR. HARRISON: I would apologize for my absence and thank you for your flexibility.

THE COURT: Then we are adjourned.

¶3    On the same day, the circuit court entered a written order extending B.M.T.'s commitment order for eleven days. B.M.T. did not object to or appeal that eleven-day extension order, and the final hearing occurred as agreed on March 8, 2022. At that hearing, B.M.T. again did not object to the date of the hearing or assert that the circuit court lost competence to hear the matter due to the delay. Rather, he participated fully in the hearing, including testifying on his own behalf. At the conclusion of the hearing, the circuit court found:

> Grounds for the extension and commitment have been established. [B.M.T.] is mentally ill. He's dangerous as defined by statute as he poses a substantial probability of physical harm to other individuals as manifested or shown by a substantial likelihood based on the subject's individual treatment records that the individual would be a proper subject for commitment if treatment were withdrawn.
>
> He is a proper subject for treatment. He's a resident of Manitowoc County. His dangerousness is likely to be controlled with the appropriate medication administered on an outpatient basis. He has been adjudicated pursuant to U.S. Code as mental defective or committed to a mental institution previously.
>
> Based on those findings, the Court is going to order that his commitment is extended for 12 months from the date of this hearing to the care and custody of the Manitowoc

4

> County Human Services Department. Maximum level of treatment shall be outpatient with conditions. [B.M.T.], I need to advise you because of the commitment you are prohibited from possessing a firearm and the Court will sign that order at this time.

The circuit court also found that medication would have therapeutic value, B.M.T. needed medication, and that:

> [t]he advantages, disadvantages and alternatives to the medication have been explained to him, but due to his mental illness he's not competent to refuse psychotropic medication or treatment because he's substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his condition in order to make an informed choice as to whether to accept or refuse psychotropic medications.

The court entered an involuntary medication order based on its findings.

¶4     B.M.T. filed a notice of intent to pursue postdisposition relief the next day. Nothing was filed, however, due to issues with his appointed counsel. After obtaining extensions from this court, B.M.T. filed his notice of appeal from the March 8, 2022 commitment and involuntary medication orders in December 2022.

¶5     In February 2023, the County filed a petition seeking to extend B.M.T.'s ch. 51 commitment orders. The circuit court appointed Dr. Marshall Bales to examine B.M.T.; however, B.M.T. refused to meet with Dr. Bales. Dr. Bales filed a report that explained: "I made several phone calls to the subject individual that all but one went to voicemail. A man answered once and denied he was the subject individual. Later, the case manager informed me the subject individual declined to meet for an examination in any fashion." The report indicated that B.M.T. was dangerous but did not identify by statute number the

5

specific subdivisions in WIS. STAT. § 51.20(1) upon which he believed B.M.T. to be dangerous.[5] The report further stated:

> Although I could not perform a medication review with [B.M.T.], I, along with many other examiners, have in the past, and he has been unable to weigh the pros and cons of psychotropics or apply the information to himself. He has had ongoing lack of insight. He has also abused or self-medicated with street drugs and/or alcohol. Therefore, it is my opinion with a reasonable degree of medical certainty that he is not competent to refuse psychotropic medication, and an involuntary medication order is requested.

¶6 The circuit court held a hearing on the petition on March 1, 2023. Only Dr. Bales and Heidi Barnes, the County's court liaison to the Manitowoc County Human Services Department, testified. As material,[6] Dr. Bales testified as follows:

- When asked whether he had the "opportunity to evaluate" B.M.T., Dr. Bales responded: "Only the records. I would add here I called his cell phone number and one time I got the voice machine with his name and another time I called the same number and somebody answered the phone and said that I have the wrong person and then hung up. Later I did contact the social worker and they contacted him and he completely declined to meet, so, therefore, I did this report by the record. I would add I did receive Circuit Court Access as well."

---

[5] The report does contain the language of all of the dangerousness standards in WIS. STAT. § 51.20(1)(a), and Dr. Bales's report placed an X next to the language found in § 51.20(1)(a)2.b and 2.c. His report also placed an X next to a box labeled "Additional standard available for recommitment hearings" that has some of the language from § 51.20(1)(am) listed.

[6] B.M.T. does not contest the circuit court's findings that he was mentally ill and a proper subject for treatment. He challenges only the dangerousness determination and the required medication discussion; therefore, this court sets forth only the testimony relevant to those issues.

6

- When asked whether he could still offer an opinion as to B.M.T.'s dangerousness, he answered: "Definitely" because he had "done reports on him several different times including in 2015, which was this case 15-ME, and I saw him at that original incident and -- but then several times since then."

- Dr. Bales testified that he looked at "[p]rior court examination[s], Wisconsin Circuit Court Access and then some Manitowoc County records[,]" and spoke to "the case manager[.]"

- The doctor confirmed that he prepared a report, which was admitted into evidence, and that it was his opinion to a reasonable degree of medical certainty that B.M.T. is dangerous because if treatment is withdrawn, B.M.T. "becomes assaultive and threatening to people." Further, Dr. Bales explained that even with treatment, B.M.T. has been charged with criminal acts, including battery, disorderly conduct, and drug possession.

- He explained that B.M.T.'s dangerousness is the result of his "mental health condition and/or antisocial behavior or it's drug use, and, frankly, it's probably some of all three." Dr. Bales said B.M.T.'s use of illegal drugs while on the psychotropic medication also makes him dangerous.

- When asked about whether B.M.T. would become dangerous to himself if treatment were withdrawn, Dr. Bales testified that he would be and indicated this is due to the way B.M.T. acts when he is off treatment: "people [like B.M.T.] with these manic, assaultive behaviors while paranoid and psychotic that they are very commonly assaultive themselves, and that's a big concern here. Is somebody going to pull a gun and shoot him when he's so psychotic and out of control and manic, but that's my opinion and I really believe that."

- Dr. Bales testified that B.M.T. will not take his medication if not on commitment, and if that happens, there is a substantial probability that B.M.T. will harm someone or harm himself.

- When asked if it is B.M.T.'s schizoaffective disorder that causes him to be dangerous, Dr. Bales answered: "It's schizoaffective disorder, complicated by some antisocial traits and drug use. I just can't say how much of each, but off street drugs and when he's been in mental health facilities in the past, he's been manic, aggressive and psychotic in the absence of drug use."

7

¶7    With respect to the involuntary medication that Dr. Bales believes

B.M.T. needs, the following exchange occurred:

> Q. You did not have an opportunity to explain the advantages, disadvantages or alternatives to medications to [B.M.T]; is that correct?
>
> A. Not this year.
>
> Q. Did [B.M.T.] decline to hear or have the opportunity for you to explain the advantages, disadvantages and alternatives to medication?
>
> A. Yes. Again, I called him and somebody at his phone number said I have the wrong person so and then hung up quickly. And then later I called that number again and it was his name and voice machine. But later then I contacted the case manager and they said he was not going to talk to me in any fashion, not even briefly, so I took that as his choice to remain silent or not meet. That's his right.
>
> Q. And had you previously explained advantages, disadvantages and alternatives to medication to [B.M.T.]?
>
> A. Yes.
>
> Q. Thank you. Doctor, do you have any opinion as to whether currently [B.M.T.] is capable of expressing an understanding of an explanation of the advantages, disadvantages and alternatives to accepting medication?
>
> A. Incapable.
>
> Q. You said incapable?
>
> A. Yes.
>
> Q. Is [B.M.T.] capable of applying the understanding of advantages, disadvantages and alternatives to his mental health disorder in order to make an informed choice about whether to accept or refuse psychotropic medications?
>
> A. He is not.
>
> Q. And I guess I want to put it in layman's terms. Is [B.M.T.] competent to consent to or refuse psychotropic medications?
>
> A. Incompetent.

¶8 Ms. Barnes testified that she recommended another twelve-month commitment extension "after talking with [B.M.T.], his case manager and his psychiatrist." She explained that B.M.T. has repeatedly said he does not need medication, he would be normal without it, and "he would not continue with services if he were not under the commitment." When asked what would happen if B.M.T. stopped taking his medications, Barnes testified: "He would most likely become psychotic and need rehospitalization and potentially a commitment again" and that "there is a good likelihood that he could become dangerous, yes."

¶9 B.M.T. did not testify or call any witnesses. After the hearing concluded, the circuit court found:

> grounds for the extension of the commitment have been established. [B.M.T.] is mentally ill. He's dangerous as defined by statute because he poses a substantial probability of physical harm to other individuals. Any substantial probability of physical impairment or injury to himself or herself or other individuals due to impaired judgment as manifested or shown by a substantial likelihood based on his individual treatment record that he would be a proper subject for commitment if treatment were withdrawn. He's a proper subject for treatment.… His dangerousness is likely to be controlled with the appropriate medication administered on an outpatient basis. He has previously been adjudicated mentally defective or committed i[n] an institution.
>
> Based on those findings, the Court is going to order that [B.M.T.'s] commitment is extended for 12 months[.]

¶10 With respect to the involuntary medication and treatment request, the circuit court found:

> the issue of involuntary administration of medication or treatment was considered at a final hearing. Medication or treatment will have therapeutic value. [B.M.T.] appeared in person and with counsel. He does need medication or treatment. The advantages, disadvantages and alternatives to the medication were not explained to him on this current go-around but have been explained to him in the past and

> due to his mental illness, he's not competent to refuse psychotropic medication for treatment because he's substantially incapable of applying the advantages, disadvantages and alternatives to his condition in order to make an informed choice as to whether or not to accept or refuse psychotropic medications.

¶11 The circuit court entered orders extending B.M.T's commitment and involuntary medication for twelve months. B.M.T. appealed the 2023 orders, and this court consolidated his two appeals.

## II. DISCUSSION

¶12 B.M.T. raises three issues in this consolidated appeal: (1) whether the circuit court lacked competency to act with respect to his 2022 commitment orders by failing to hold the final hearing before the prior commitment order expired on February 27, 2022, and by failing to hold the final hearing within seven calendar days of the originally scheduled final hearing; (2) whether the circuit court failed to make specific findings that B.M.T. was dangerous as required by *Langlade County v. D.J.W.*, 2020 WI 41, ¶59, 391 Wis. 2d 231, 942 N.W.2d 277; and (3) whether the County failed to meet its burden with respect to the 2023 involuntary medication order.

### *A. 2022 Commitment Order and Circuit Court Competency to Act*

¶13 B.M.T. contends the circuit court lacked competency to act because his final 2022 recommitment hearing was not held until March 8, 2022. He says this date was too late because his prior commitment order expired on February 27, 2022, and when his attorney could not make it to the scheduled final hearing on February 25, 2022, due to a snowstorm, any extension from that date was limited to seven calendar days pursuant to WIS. STAT. § 51.20(10)(e). Thus, he says,

because March 8, 2022, was *eleven* days after February 25, 2022, the circuit court lacked competency to act.[7]

¶14    WISCONSIN STAT. § 51.20(10)(e) provides: "At the request of the subject individual or his or her counsel the final hearing under par. (c) may be postponed, but in no case may the postponement exceed 7 calendar days from the date established by the court under this subsection for the final hearing." The statute is very clear, and when B.M.T.'s counsel asked for an extension because a snowstorm prevented him from getting to the courthouse for the February 25, 2022 hearing, the circuit court should have known that the statute only permits a seven-calendar-day extension.

¶15    The County argues that WIS. STAT. § 51.20(10)(e)'s seven-calendar-day extension does not control here, however, because the circuit court did not rely on that statute but instead entered an order *extending* B.M.T.'s recommitment for eleven days from February 25, 2022 (to March 8, 2022). The County points to its attorney's clarification at the February 25th hearing that "the order and all conditions are being extended" and the fact that the Record contains a written eleven-day recommitment extension order from which B.M.T. did not appeal.

¶16    B.M.T. replies that the circuit court's first words at the February 25th hearing were that it "extend[ed] the *hearing*" (emphasis added), rather than B.M.T.'s commitment order. He further argues that an eleven-day

---

[7] In his initial appellate brief, B.M.T. asserts that the hearing ultimately "took place on March 8, 2022, nine days after the originally scheduled February 25 date." Although it ultimately is not pertinent to the resolution of this issue, March 8th is *eleven* days after February 25th (the date initially scheduled for the recommitment hearing); it is *nine* days after February 27th—the date the commitment order expired.

11

extension order would require the County to comply with the ch. 51 statutory procedures for seeking an extension of the commitment orders and that the March 8th recommitment and medication orders were therefore invalid.

¶17     This court need not resolve the merits of this dispute because B.M.T. forfeited any right to challenge the circuit court's competency by failing to object at the March 8, 2022 hearing.   If B.M.T. wanted to challenge the court's competence, he needed to object to it in the circuit court.   *See City of Cedarburg v. Hansen*, 2020 WI 11, ¶¶49, 55, 390 Wis. 2d 109, 938 N.W.2d 463, *opinion modified on reconsideration*, 2020 WI 45, 391 Wis. 2d 671, 943 N.W.2d 544 ("[A]n objection to a court's competence can be forfeited if it is not raised in a timely manner.").   B.M.T. did not make a timely competence objection, and he fully participated in the March 8th hearing that he now claims the court lacked competence to conduct.   Moreover, it was B.M.T.'s counsel who prevented the final hearing from taking place as scheduled on February 25th and who requested the extension.   B.M.T.'s counsel did not object to the March 8th hearing date and

did not object to the written order extending the recommitment order for eleven days. This court therefore concludes B.M.T. forfeited any competency challenge.[8]

### B. 2023 Commitment Dangerousness Determination

¶18 B.M.T.'s next challenge is to the circuit court's determination in the 2023 commitment order that he is dangerous. Specifically, he contends that the court failed to mention the specific WIS. STAT. § 51.20 subdivision upon which the dangerousness determination was made—it was not mentioned in the petition for recommitment, it was not mentioned by either witness at the hearing, and the circuit court failed to state which subdivision of the statute it based its ruling on. B.M.T. argues that *D.J.W.* required the circuit court to make this specific finding.

¶19 Before specifically addressing B.M.T.'s argument, it is necessary to first identify the general principles governing a WIS. STAT. ch. 51 recommitment governed by WIS. STAT. § 51.20. To involuntarily commit an individual, a county must establish by clear and convincing evidence that the person is mentally ill, a proper subject for treatment, and dangerous. Sec. 51.20(1)(a)1-2, (13)(e),

---

[8] B.M.T. relies on *G.O.T. v. Rock County*, 151 Wis. 2d 629, 636, 445 N.W.2d 697 (Ct. App. 1989), but that case preceded our supreme court's decision holding that a failure to timely challenge competence forfeits the right to raise it on appeal. *See City of Cedarburg v. Hansen*, 2020 WI 11, ¶¶49, 55, 390 Wis. 2d 109, 938 N.W.2d 463, *opinion modified on reconsideration*, 2020 WI 45, 391 Wis. 2d 671, 943 N.W.2d 544 ("[A]n objection to a court's competence can be forfeited if it is not raised in a timely manner."). Further, in a more recent case decided after *G.O.T.*, this court held judicial estoppel precluded dismissal of a ch. 51 commitment when the delay beyond the statutory timeline occurred at the request of the subject of the commitment. *See County of Milwaukee v. Edward S.*, 2001 WI App 169, ¶7, 247 Wis. 2d 87, 633 N.W.2d 241 (applying judicial estoppel in a ch. 51 case because the subject of the commitment requested an adjournment beyond the statutory deadline in the circuit court and then on appeal objected to the circuit court granting the requested adjournment). This court is not persuaded by B.M.T.'s argument that *Edward S.* does not apply simply because the County agreed to the adjournment his counsel requested. The County's attorney was present in the courtroom for the February 25th hearing ready to proceed despite the snowstorm. The delay is solely attributed to B.M.T.

(13)(g)3; *Waukesha County v. J.W.J.*, 2017 WI 57, ¶18, 375 Wis. 2d 542, 895 N.W.2d 783.

¶20     "To prevail in a recommitment proceeding, the petitioner must demonstrate the same three elements necessary for the initial commitment[,]" but "'WIS. STAT. § 51.20(1)(am) provides a different avenue for proving dangerousness if the individual has been the subject of'" commitment immediately before the recommitment petition. *Sheboygan County v. M.W.*, 2022 WI 40, ¶¶18-19, 402 Wis. 2d 1, 974 N.W.2d 733 (quoting *Portage County v. J.W.K.*, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509). Dangerousness "'may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn.'" *M.W.*, 402 Wis. 2d 1, ¶20 (quoting WIS. STAT. § 51.20(1)(am)). This method of proving dangerousness is necessary because "'an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur.'" *M.W.*, 402 Wis. 2d 1, ¶20 (quoting *J.W.K.*, 386 Wis. 2d 672, ¶19). If a county relies on § 51.20(1)(am) to prove dangerousness, a link to one of the five dangerousness standards from § 51.20(1)(a)2 is required. *D.J.W.*, 391 Wis. 2d 231, ¶59.

¶21     Our supreme court set forth the applicable standards for reviewing ch. 51 recommitment cases in *D.J.W.*:

> In a recommitment proceeding, the burden is on the County to prove by clear and convincing evidence all required facts. WIS. STAT. § 51.20(13)(e); *Winnebago [County] v. J.M.*, 2018 WI 37, ¶59, 381 Wis. 2d 28, 911 N.W.2d 41. Whether the County has met its burden is a mixed question of law and fact. *Waukesha [County] v. J.W.J.*, 2017 WI

14

57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. First, we will uphold a circuit court's findings of fact unless they are clearly erroneous. *Id.* A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence. *Metro[politan] Assocs. v. City of Milwaukee*, 2018 WI 4, ¶62, 379 Wis. 2d 141, 905 N.W.2d 784. Second, we review whether the facts satisfy the statutory standard. *J.W.J.*, 375 Wis. 2d 542, ¶15. In our review, we interpret and apply WIS. STAT. § 51.20. Statutory interpretation and application are questions of law that we review independently of the determinations rendered by the circuit court and court of appeals. *Metro[politan] Assocs.*, 379 Wis. 2d 141, ¶24.

*D.J.W.*, 391 Wis. 2d 231, ¶¶23-25 (formatting altered).

¶22 Here, B.M.T. challenges only the dangerousness element, and therefore, this court need not address the other two elements. B.M.T. claims the absence of a specific reference to any statutory dangerousness standard requires reversal of the circuit court's decision. As set forth above, B.M.T. is correct that neither Dr. Bales nor the circuit court specifically identified the statutory subdivision relied upon in concluding that he was dangerous. *D.J.W.*, which requires such a finding, held: "[C]ircuit courts in recommitment proceedings are *to make specific factual findings with reference to the subdivision paragraph* of [WIS. STAT.] § 51.20(1)(a)2. on which the recommitment is based." *Id.*, ¶59 (emphasis added).

¶23 *D.J.W.* provided two reasons for requiring the "specific factual findings" and "reference to the specific subdivision paragraph": (1) "it provides clarity and extra protection to patients regarding the underlying basis for a recommitment"; and (2) it "will clarify issues raised on appeal of recommitment orders and ensure the soundness of judicial decision making[.]" *Id.*, ¶¶42, 44.

15

¶24    It is troubling that circuit courts are still failing to comply with *D.J.W.*'s specific directive, which our supreme court announced almost four years ago in April 2020.  *D.J.W.*'s directive is neither complicated nor difficult to understand.  In no uncertain terms, it says that a circuit court should specifically identify the WIS. STAT. § 51.20(1)(a)2 statutory subdivision it is relying on in making the dangerousness determination.  The circuit court did not do that here.

¶25    The County argues that despite the circuit court's failure to identify the specific WIS. STAT. § 51.20(1)(a)2 subdivisions it relied on, the circuit court's words nevertheless made it clear to B.M.T. that it found him dangerous under § 51.20(1)(a)2.b and 2.c because the language the circuit court used in its oral ruling lines up "exactly" with the words of those subdivisions.  This court disagrees.

¶26    The petition to extend B.M.T.'s commitment does not identify any specific WIS. STAT. § 51.20(1)(a)2 subdivisions—it simply parrots some of § 51.20(1)(am)'s language.  The petition does not mention § 51.20(1)(a)2.b or 2.c at all, and accordingly, the petition itself does not give B.M.T. notice that the underlying basis for his recommitment will be that he is dangerous under § 51.20(1)2.b and 2.c.  While Dr. Bales's report suggests that the basis for dangerousness is § 51.20(1)(am), linked to both § 51.20(1)(a)2.b and 2.c by using the language from those statutes, his report does not actually identify any specific statutory subdivision.  Moreover, no statutory subdivisions were mentioned at any time during the hearing.

¶27    WISCONSIN STAT. § 51.20(1)(a)2.b allows a subject to be found dangerous if he:

> Evidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.

And, § 51.20(1)(a)2.c allows a subject to be found dangerous if he:

> Evidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals. The probability of physical impairment or injury is not substantial under this subd. 2.c. if reasonable provision for the subject individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services, if the individual may be provided protective placement or protective services under ch. 55[.]

Dr. Bales testified about past dangerous acts and his belief that B.M.T. may become dangerous again if treatment is withdrawn as well as that B.M.T. may be dangerous to others when treatment is withdrawn because B.M.T. "becomes assaultive and threatening to people" when not medicated. He also testified that B.M.T. is a danger to himself because he will act out if untreated, which could cause others to hurt him. The County contends that this testimony sufficiently identifies a link to the second (WIS. STAT. § 51.20(1)(a)2.b) and the third (§ 51.20(1)(a)2.c) dangerousness standards. The *circuit court*, however, neither made specific factual findings based on Dr. Bales's testimony nor made reference to the respective statutory standard, which *D.J.W.* explicitly requires of circuit courts in ch. 51 proceedings.

¶28 Despite having failed to make such findings and despite having failed to make any such references, at the conclusion of the hearing, the circuit court nevertheless found the County had established dangerousness by clear and

convincing evidence. The court's entire statement on dangerousness was that B.M.T. is

> dangerous as defined by statute because he poses a substantial probability of physical harm to other individuals. Any substantial probability of physical impairment or injury to himself or herself or other individuals due to impaired judgment as manifested or shown by a substantial likelihood based on his individual treatment record that he would be a proper subject for commitment if treatment were withdrawn.

The circuit court's statement is simply a conclusory statement that does not address all parts of WIS. STAT. § 51.20(1)(a)2.b or 2.c. This is insufficient under **D.J.W.** as it does not satisfy either purpose our supreme court discussed in that case. First, the circuit court's ruling does not provide B.M.T. clarity as to the basis upon which he is currently dangerous. Second, it fails to provide this court with clarity as to which WIS. STAT. § 51.20 dangerousness subdivision the circuit court relied on in making its decision. It is not clear to this court from the circuit court's two sentences—which jumble together a few words from § 51.20(1)(a)2.b, 2.c, and § 51.20(1)(am) and comprise the circuit court's *entire* explanation on dangerousness—that the circuit court found B.M.T. dangerous under § 51.20(1)(am) with a link to § 51.20(1)(a)2.b and 2.c. The circuit court's decision does not contain *specific factual findings* on dangerousness or *reference* to the subdivision paragraph.

¶29 **D.J.W.** directed that "circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of § 51.20(1)(a)2. on which the recommitment is based." **D.J.W.**, 391 Wis. 2d 231, ¶59. As our supreme court explained:

> With such an important liberty interest at stake, the accompanying protections should mirror the serious nature of the proceeding. Requiring circuit courts to provide

18

*specific factual findings* with *reference to the subdivision paragraph* of WIS. STAT. § 51.20(1)(a)2. on which the recommitment is based provides increased protection to patients to ensure that recommitments are based on sufficient evidence.

*D.J.W.*, 391 Wis. 2d 231, ¶43 (emphases added; footnote omitted). The circuit court here failed to do so.

¶30 Because the circuit court failed to comply with *D.J.W.*'s directive to both make factual findings and to then tie those factual findings to the specific dangerousness subdivision, the 2023 commitment order must be reversed as does the involuntary medication order because it is dependent upon the validity of the commitment order.[9]

### III. CONCLUSION

¶31 This court affirms the orders in B.M.T.'s 2022 commitment (Appeal No. 2022AP2079). This court reverses the orders in B.M.T.'s 2023 commitment (Appeal No. 2023AP904).[10]

*By the Court.*—Orders affirmed in part; orders reversed in part.

---

[9] It is not necessary for this court to specifically address B.M.T.'s involuntary medication issue because only dispositive issues need be addressed. *See Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15 ("[A]ppellate court[s] should decide cases on the narrowest possible grounds.").

[10] Although the 2023 orders do not expire until March 8, 2024, the circuit court no longer has competency to act as to the 2023 recommitment because the previous recommitment order— the 2022 order—expired on March 8, 2023. *See Walworth County v. M.R.M.*, 2023 WI 59, ¶24, 408 Wis. 2d 316, 992 N.W.2d 809 ("[T]he failure to enter a lawful extension order before the preceding order expires results in a loss of competency."). Accordingly, reversal—rather than remand—is the appropriate remedy.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.